**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**C.A. No. 5:12-cv-389**

| | | |
|---|---|---|
| **ASHLEY OWENS and NINA OWENS,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **COMPLAINT** |
| **DIXIE MOTOR COMPANY, JANET** | ) | **JURY TRIAL DEMANDED** |
| **PIERCE, ANTWAND CHERRY,** | ) | |
| **WESTERN SURETY CO., and EQUIFAX** | ) | |
| **INFORMATION SERVICES, LLC,** | ) | |
| **Defendants.** | ) | **(Refiled to correct filing deficiency)** |
| _____ | ) | |

NOW COME ASHLEY OWENS and NINA OWENS, by and through counsel, and make this Complaint against Defendants, DIXIE MOTOR COMPANY, JANET PIERCE, ANTWAND CHERRY, WESTERN SURETY CO., and EQUIFAX INFORMATION SERVICES, LLC, alleging and saying as follows:

## INTRODUCTION:

This is an action for damages brought by two individual consumers for Defendants' violations of the Fair Credit Reporting Act (hereinafter "FCRA") and of North Carolina law. Plaintiffs allege that Defendants accessed credit report information without authorization, breached their duties to secure and properly dispose of personal identifying information, and subjected them to harassment and a lifelong risk of identity theft and financial fraud.

## JURISDICTION

1.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) and pursuant to 15 U.S.C. § 1681p.

2.      This action arises out of Defendants' violations of the FCRA and North Carolina

law.

3.      Venue is proper in this judicial district because one of the Defendants, Antwand Cherry, resides in this district, and made telephone calls originating from within this district that are the basis for some of Plaintiffs' claims against Defendants.

4.      This case is brought within four years of the Defendants' violations of North Carolina's Unfair and Deceptive Trade Practices Act and Identity Theft Protection Act, in compliance with the statute of limitations for those Acts at N.C.G.S. § 75-16.2; within three years of Defendants' actions giving rise to Plaintiffs' tort claims, in compliance with the statute of limitations at N.C.G.S. § 1-52(5); and within two years of the date of discovery of the FCRA violations in compliance with the statute of limitations at 15 U.S.C. § 1681p(1).

## PARTIES

### Ashley Owens and Nina Owens

5.      Plaintiff ASHLEY OWENS (hereinafter, "ASHLEY") is a natural person with a principal residence in City of Plymouth, County of Washington, North Carolina.

6.      Plaintiff NINA OWENS (hereinafter, "NINA") is a natural person with a principal residence in City of Plymouth, County of Washington, North Carolina.

7.      NINA is ASHLEY's mother.

### Dixie Motor Company

8.      Defendant DIXIE MOTOR COMPANY (hereinafter, "DIXIE") is a North Carolina corporation with a principal place of business at 104 West Boulevard, Williamston, North Carolina  27892, and a registered agent for service of process at the same address.

9.      DIXIE is a motor vehicle dealership subject to the Motor Vehicle Dealers and Manufacturers Licensing Law, N.C.G.S. §§ 20-285, et seq.

10.     At all times relevant to this Complaint, DIXIE was engaged in commerce in the

State of North Carolina.

11.　　DIXIE is significantly engaged in providing financial services to its customers and potential customers, as it arranges and provides financing for the purchase of vehicles.

**Janet Pierce**

12.　　Defendant JANET PIERCE (hereinafter, "PIERCE") is a natural person and resident of the City of Windsor, County of Bertie, State of North Carolina.

13.　　Upon information and belief, based upon the representations of PIERCE and representations on DIXIE's website at dixiemotor.blogspot.com, at all times relevant to this Complaint, DIXIE employed PIERCE as its finance manager.

14.　　At all times relevant to this complaint, PIERCE was engaged in DIXIE'S dealership business and acting within the course and scope of her authority, and DIXIE is therefore liable for the acts or omissions of PIERCE via respondeat superior.

**Antwand Cherry**

15.　　Defendant ANTWAND CHERRY (hereinafter, "CHERRY") is a natural person who resides as an inmate in the Nash Correctional Institution, City of Nashville, County of Nash, State of North Carolina.

16.　　Upon information and belief, based upon the records available on the website of the North Carolina Department of Corrections, Defendant CHERRY uses the alias "Mickey Mouse."

17.　　Upon information and belief, based upon the records available on the website of the North Carolina Department of Corrections, Defendant CHERRY has a criminal record dating back to 1995, including conviction for offenses such as drug dealing, drug possession, larceny, felony breaking and entering, assault, communicating threats, violation of a protective order, and

resisting an officer.

18.     Upon information and belief, based upon a news report in the <u>Roanoke-Chowan News Herald</u> newspaper, the arrests and convictions that led to CHERRY's current incarceration are related to "opium trafficking."

19.     Upon information and belief, based upon the statements of Defendant CHERRY and a review of the Defendants' web pages on the social network Facebook, Defendants PIERCE and CHERRY have a personal relationship with each other.

20.     As recently as May 10, 2012, that is, subsequent to the events described herein, CHERRY and PIERCE were Facebook "friends."

## Western Surety Co.

21.     Upon information and belief, Defendant Western Surety Co. (hereinafter, "WESTERN"), is a South Dakota corporation with a principal place of business at 333 S. Wabash Ave., Chicago, Illinois 60604, and process can be served on WESTERN through the North Carolina Commissioner of Insurance.

22.     WESTERN has engaged in substantial activity within the State of North Carolina in that it has a license from the North Carolina Department of Insurance and has provided motor vehicle surety bonds to various North Carolina motor vehicle dealers, including Defendant DIXIE.

23.     Upon information and belief, based on the statements of DMV staff, DIXIE'S bond from WESTERN is listed with the North Carolina Department of Motor Vehicles as Bond Number 41232870.

## Equifax Information Services, LLC

24.     Defendant EQUIFAX INFORMATION SERVICES, LLC (hereinafter,

"EQUIFAX") is a Georgia corporation with a principal place of business at 1550 Peachtree Street, NW, Atlanta, Georgia 30309, and a registered agent, Corporation Service Company, at 327 Hillsborough Street, Raleigh, North Carolina 27603.

25.     EQUIFAX is a "consumer reporting agency" as defined by 15 U.S.C. § 1681(f).

26.     EQUIFAX is regularly engaged in the business of assembling, evaluating, and distributing information concerning consumers for the purpose of furnishing consumer reports, as defined by15 U.S.C. § 1681(d), for third parties.

27.     Third parties pay EQUIFAX in return for the receipt of such consumer reports.

## FACTUAL ALLEGATIONS

28.     In October 2011, Plaintiff ASHLEY OWENS wanted to buy a car.

29.     Her mother, Plaintiff NINA OWENS, had previously purchased a vehicle through Defendant DIXIE and had done further business with DIXIE for repairs on said vehicle.

30.     Being familiar with the dealership through her mother, ASHLEY visited Defendant DIXIE's dealership and selected a Dodge Charger vehicle for purchase.

31.     She applied for vehicle financing through DIXIE on or about October 29, 2011.

32.     Defendant PIERCE handled ASHLEY's finance application.

33.     DIXIE's credit application required that ASHLEY give DIXIE personal information, including her Social Security Number, birth date, home address, home phone number, and cell phone number.

34.     DIXIE's credit application also required that ASHLEY give DIXIE information about her income, including the amount and her employer's name, telephone number, and address.

35.     DIXIE also required a copy of ASHLEY's drivers' license, which contained her

license number, full name, address, date of birth, photograph, and physical description.

36.    DIXIE's privacy policy states that DIXIE will "ensure your private information is kept private and only shared with those companies who are authorized either by yourself or as allowed or required by law."

37.    DIXIE's privacy policy also states that, with respect to safeguarding personal information,

> *"We safeguard nonpublic personal information according to*
> *established industry standards and procedures.  We maintain*
> *physical and electronic safeguards that comply with state and*
> *federal law.  We restrict access to nonpublic personal information*
> *about you to those employees and outside contractors who need to*
> *know the information to provide product or service to you.  We*
> *prohibit our employees and agents from giving information about*
> *you to anyone in a manner that would violate any applicable law*
> *or our privacy policy."*

38.    Said privacy policy is included on DIXIE's public internet website that advertises its business to the public and solicits credit applications from the public.

39.    PIERCE, on behalf of DIXIE, used ASHLEY's personal information to request ASHLEY's credit report from a credit reporting agency.

40.    PIERCE made a printout of the credit report results.

41.    The credit report results contained ASHLEY's name, Social Security Number, and current and past residential addresses.

42.    The credit report results also contained information about ASHLEY's financial

obligations and her credit score.

43.     During the application process in PIERCE's office, PIERCE spoke and behaved in an manner that ASHLEY felt was unprofessional and that made ASHLEY feel uncomfortable.

44.     After PIERCE saw ASHLEY's credit report, she also tried to persuade ASHLEY to sign up for credit repair services through a separate company that PIERCE claimed to run.

45.     ASHLEY declined to sign up for credit repair services with PIERCE.

46.     Ultimately, DIXIE and PIERCE rejected ASHLEY's credit application and did not arrange financing for a vehicle purchase for her.

47.     After DIXIE and PIERCE rejected her application for credit, ASHLEY believed that that DIXIE and PIERCE would safeguard and properly dispose of the personal information she gave them when applying for credit.

48.     After DIXIE and PIERCE rejected her application for credit, an agent or employee of DIXIE falsified a credit application in the name of ASHLEY's mother, NINA.

49.     The falsified credit application for NINA included some of NINA's personal information, including her Social Security Number, birth date, home address, home phone number, and work phone number.

50.     The falsified credit application for NINA included information about NINA's income, including an income amount, her employer's name, the amount of her monthly mortgage payment, and her mortgage lender's name.

51.     The falsified credit application did not contain NINA's signature.

52.     An employee of DIXIE with a system user ID of "PIERCEJ" then used the personal information about NINA to obtain NINA's credit report from a credit reporting agency, EQUIFAX, on behalf of DIXIE on or about November 1, 2011.

7

53.     Because the user ID of the person making the credit report request was "PIERCEJ," Plaintiffs believe that the person who obtained the report was Defendant PIERCE.

54.     At the time DIXIE obtained NINA's credit report, to NINA's recollection, no one associated with DIXIE had requested NINA's permission to obtain her EQUIFAX credit report.

55.     At the time DIXIE obtained NINA's credit report, NINA had not given anyone associated with DIXIE any authorization to obtain her credit report.

56.     In fact, NINA was unaware that DIXIE had obtained her credit report until months later.

57.     In releasing NINA's credit report to DIXIE in a situation where NINA had not authorized the release of her report, the credit application was falsified and unsigned, and DIXIE did not have a permissible purpose for obtaining the report, EQUIFAX failed to comply with the FCRA requirements regarding ensuring that DIXIE was going to use the information for a permissible purpose and failed to maintain reasonable procedures to limit the furnishing of consumer reports to those with permissible purposes.

58.     An unknown agent or employee of DIXIE made a printout of the credit report results on NINA.

59.     The credit report results contained NINA's name, Social Security Number, current and past residential addresses.

60.     The credit report results also contained information about NINA'S financial obligations and her credit score.

61.     Approximately a month later, around Thanksgiving 2011, ASHLEY began receiving telephone calls on her cellular telephone from a number that she did not recognize.

62.     ASHLEY later received a call from the same number at her home telephone line.

63.     The call began with a message stating that the call was a collect call from a prison inmate.

64.     ASHLEY did not know any inmates, so she did not accept the call.

65.     However, when the same number called repeatedly, ASHLEY decided to accept the call to see who was calling.

66.     When she accepted the collect call, the caller asked for ASHLEY by name.

67.     The caller told her he was "Mouse" and asked her if she had bought a vehicle.

68.     "Mouse" then told ASHLEY that he had her Social Security Number and other personal information.

69.     He stated that his friend, "Janet," who worked in finance, had mailed him ASHLEY'S personal information.

70.     Very frightened, ASHLEY denied that she was Ashley Owens and told the caller something to the effect that "Ms. Owens has gone to live in Virginia" in the hopes that he would not call her any further.

71.     The man who called himself "Mouse" also stated that he was in prison and indicated that he would send ASHLEY her personal information back if she would get his friend "Janet" to call him.

72.     He complained that "Janet" was supposed to be helping him but now she wouldn't accept his calls.

73.     The man who called himself "Mouse" also asked ASHLEY if she lived alone, and whether she was married or single.

74.     He gave ASHLEY his friend "Janet's" phone number and asked her to call "Janet" and tell her to come visit him or to call him.

75. ASHLEY then learned that the "Janet" in question was Defendant PIERCE.

76. ASHLEY was extremely frightened that a prison inmate unknown to her and with unknown crimes, now had all of her personal identifying information and knew where she lived.

77. ASHLEY feared that the inmate would give out her personal information to other criminals in the prison.

78. She feared that the inmate or another inmate to whom he might have given her information might get out of prison, come to her home, and commit crimes against her.

79. She also feared that PIERCE, the inmate, or another inmate to whom he might have given her information might fraudulently use her identity.

80. ASHLEY reported the matter to police in Williamston, North Carolina on or about December 6, 2011 as a case of possible fraud.

81. The Williamston Police Department interviewed PIERCE.

82. Upon information and belief, based on the incident report of the Williamston Police Department, PIERCE identified the inmate in question as Defendant CHERRY.

83. According to the police report, PIERCE claimed that she sent ASHLEY's loan application file to CHERRY by accident.

84. According to the police report, PIERCE claims that ASHLEY's loan application file somehow was in the same location as "some legal paperwork" of CHERRY's.

85. According to the police report, PIERCE stated that she "Must have placed the paperwork on top of [ASHLEY'S] file and when she went to put the legal paperwork into the envelope she inadvertently picked up both the legal and Loan Application at the same time and placed both into it."

86. ASHLEY'S loan application file that was given to CHERRY contained at least

twenty-one (21) pages of documents.

87.     According to the police report, PIERCE also told the police that "if she was attempting to transfer personal information for fraudulent purposes it would not [have] been someone who had bad credit."

88.     ASHLEY never authorized PIERCE or DIXIE to release information about the nature of her credit report to the police department.

89.     To the Plaintiffs' knowledge, there is no law that would authorize PIERCE and DIXIE to release information about the state of ASHLEY's credit score to the local police department.

90.     The release of information about ASHLEY's credit score to local police appears directly to violate DIXIE's stated privacy policy.

91.     ASHLEY was embarrassed and angered that PIERCE had derided ASHLEY's credit score to the officer.

92.     Subsequently, PIERCE called ASHLEY, giving conflicting versions of what had happened and trying to persuade ASHLEY that nothing illegal or wrongful was going on.

93.     CHERRY also continued to call ASHLEY repeatedly.

94.     For example, between December 18, 2011, and January 9, 2012, CHERRY called ASHLEY at least twelve times.

95.     He also called NINA's house.

96.     Subsequent to the involvement of the undersigned attorney in the investigation of this matter, DIXIE turned over to Plaintiffs the twenty-one (21) pages of documents that it said PIERCE had given to CHERRY.

97.     To the Plaintiffs' horror, the documents included not only ASHLEY'S complete

personal identifying information and credit report, but also the falsified application containing NINA'S personal information and NINA'S credit report from EQUIFAX.

98.     Up until that point, NINA had no idea that DIXIE and PIERCE had falsified a credit application in her name and obtained her credit report without her permission.

99.     Up until that point, NINA had had no idea that someone had given her personal identifying information to a prison inmate.

100.     Neither ASHLEY nor NINA ever authorized PIERCE or DIXIE to release their personal identifying information to CHERRY or any other prison inmate.

101.     To the Plaintiffs' knowledge, there is no law that would authorize PIERCE and DIXIE to release their personal identifying information to CHERRY or any other prison inmate.

102.     The release of Plaintiffs' personal identifying information to CHERRY or any other prison inmate appears to violate DIXIE's stated privacy policy.

103.     ASHLEY continues to feel frightened, particularly at night, as she cannot currently afford to move to a new address.

104.     She feels constant concern that CHERRY or one of his criminal associates may show up at her house at night and attempt to do her harm.

105.      Since NINA and ASHLEY hired an attorney to investigate this matter, a person or persons unknown to them has come on several occasions to NINA'S home and vandalized her vehicle, incidents which local law enforcement is currently investigating.

106.     NINA and ASHLEY fear that the criminal associates of PIERCE and CHERRY are out to punish them for taking action against PIERCE, CHERRY, and DIXIE.

107.     ASHLEY and NINA also fear identity theft attempts against them in the future, such as fraudulent attempts to use their identities to obtain credit, to obtain licenses, to steal their

tax refunds, to obtain social service benefits, or to use their Social Security numbers for employment purposes (which could expose ASHLEY and NINA to tax liability for wages earned by others).

108.    ASHLEY and NINA have no idea and, indeed, no way of ever knowing with exactly how many other prison inmates CHERRY might have shared their personal and financial information, nor the identities of such inmates.

109.    Upon information and belief, based on the website of the North Carolina Department of Public Safety, Nash Correctional Institution currently houses six-hundred-and forty (640) inmates.

110.    In other words, at least six-hundred and forty convicted criminals could potentially have accessed the personal identifying information of NINA and ASHLEY.

111.    To protect against future identity theft, Plaintiffs must put security freezes on their credit reports with the three major credit bureaus.

112.    Said security freezes have and shall continue to cause great inconvenience to Plaintiffs, as Plaintiffs must maintain PIN Numbers for their own credit reports and request with their PIN Numbers temporary relief from the security freezes each time that they attempt to obtain credit.

113.    Because Plaintiffs face an increased risk of identity theft, they must also undertake the expense of credit report monitoring to ensure that they receive notice of future items on their credit reports that may be the result of use of their identities by identity thieves and of items yet unknown to them that may already have resulted from past use of their identities caused by Defendants' security breach.

114.    As a result of Defendants' actions, ASHLEY has suffered emotional distress, fear,

anxiety, and inconvenience in attempting to resolve this matter, and has had to hire an attorney.

115.     As a result of Defendants' actions, NINA has also suffered emotional distress, fear, anxiety, and inconvenience in attempting to resolve this matter, and has had to hire an attorney.

116.     Plaintiffs were unable to find an attorney to assist them with this matter in Eastern North Carolina.

117.     To meet with her attorney, ASHLEY must use the entirely of a work day to drive 300 miles round-trip.

118.     Plaintiffs have been inconvenienced and have incurred out-of-pocket expenses in dealing with this matter.

119.     Upon information and belief, based on DIXIE's website, DIXIE continues to employ PIERCE despite her reckless and disturbing actions in this matter.

## CAUSES OF ACTION

### Count One:

### (As to Defendant DIXIE)

### Violation of the Identity Theft Protection Act ("IDTPA")

### N.C.G.S. § 75-60, et seq.

120.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

121.     The North Carolina Identity Theft Protection Act at N.C.G.S. § 75-60, et seq., governs how businesses should maintain and dispose of records containing personal information of consumers and how businesses should handle breaches of the security of personal information of consumers.

122.    DIXIE is a "business" as defined by the IDTPA at N.C.G.S. § 75-61(1).

123.    Plaintiffs are "consumers" as defined by the IDTPA at N.C.G.S. § 75-61(2).

124.    The IDTPA at N.C.G.S. § 75-62(6) states that a business may not "intentionally disclose an individual's social security number to a third party without written consent to the disclosure from the individual, when the party making the disclosure knows or in the exercise of reasonable diligence would have reason to believe that the third party lacks a legitimate purpose for obtaining the individual's social security number."

125.    Defendant DIXIE via its employee PIERCE intentionally disclosed the social security numbers of ASHLEY and NINA to Defendant CHERRY without written consent and when it knew that CHERRY lacked a legitimate purpose for obtaining the Plaintiffs' social security numbers.

126.    Under N.C.G.S. § 75-62(d), a violation of the IDTPA at N.C.G.S. § 75-62 is a violation of N.C.G.S. § 75-1.1, unfair and deceptive trade practices.

127.    The IDTPA at N.C.G.S. § 75-64(a) provides that "Any business that conducts business in North Carolina and any business that maintains or otherwise possesses personal information of a resident of North Carolina must take reasonable measures to protect against unauthorized access to or use of the information in connection with or after its disposal."

128.    Defendant DIXIE failed to take reasonable measures to protect against unauthorized access to or use of the Plaintiffs' personal information in connection with or after its disposal.

129.    Defendant DIXIE was negligent in the training, monitoring, and supervision of its employees involved in the unauthorized access.

130.    Under N.C.G.S. § 75-64(f), a violation of the IDTPA at N.C.G.S. § 75-64 is a

violation of N.C.G.S. § 75-1.1, unfair and deceptive trade practices.

131. The North Carolina IDTPA at N.C.G.S. § 75-65 provides that businesses that maintain or possesses records or data containing personal information of residents of North Carolina must notify affected persons of any security breach immediately following discovery or notification of the breach.

132. The IDTPA at N.C.G.S. § 75-65 also requires that said notice of security breach contain seven specific types of information.

133. Defendant DIXIE did not notify Plaintiffs of the security breach as required by the IDTPA.

134. Plaintiff ASHLEY OWENS learned of the security breach first from Defendant CHERRY, and then from local police after they interviewed Defendant PIERCE.

135. Only then did DIXIE make any attempt to contact ASHLEY, and it still has not provided to ASHLEY the information required in the statutory notice form.

136. DIXIE never notified Plaintiff NINA OWENS of the security breach of her information at all.

137. NINA did not learn of the security breach of her information until the undersigned counsel received more than three months later from DIXIE'S agent a copy of the documents that DIXIE and PIERCE had wrongfully distributed to CHERRY.

138. DIXIE still has not provided to NINA the information required in the statutory notice form.

139. Under N.C.G.S. § 75-65(i), a violation of the IDTPA at N.C.G.S. § 75-65 is a violation of N.C.G.S. § 75-1.1, unfair and deceptive trade practices.

140. Defendant's acts and omissions are also unfair and deceptive in violation of

N.C.G.S. § 75-1.1 in that they offend established public policy, and are immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and have the capacity or tendency to mislead.

141.    As a result of Defendant's acts and omissions, Plaintiffs have suffered injury including emotional distress, fear, anxiety, and inconvenience in attempting to resolve this matter, have an will incur expenses associated with safeguarding their identities from theft, and have had to hire an attorney.

142.    As a result of Defendant DIXIE'S violations of the IDTPA, Plaintiffs are entitled to individual damages pursuant to N.C.G.S. 75-62(d), 75-64(f), and 75-65(i) for each violation injuring each Plaintiff and attributable to Defendant; for trebling of such damages pursuant to N.C.G.S. §75-16; and, reasonable attorney's fees and costs pursuant to N.C.G.S. §75-16.

143.    Defendant is also liable for punitive damages in that it conducted its wrongful behavior described hereinabove willfully, intentionally, maliciously, and with reckless disregard for Plaintiffs' rights and interests.

**Count Two:**

**(As to Defendants DIXIE and PIERCE)**

**Violation of the Fair Credit Reporting Act ("FCRA"):  Wrongful Procurement of the**

**Credit Report of NINA OWENS**

**15 U.S.C. §§ 1681b(f)**

144.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

145.    Under the FCRA at 15 U.S.C. § 1681b(f), any person is prohibited from obtaining a credit report on a consumer unless the person has a permissible purpose for procuring the

report and certifies that purpose to the consumer reporting agency.

146.    The permissible purposes allowed by the Act are set forth in 15 U.S.C. § 1681b.

147.    Under 15 U.S.C. § 1681b(a)(3)(A), a potential lender such as DIXIE has a permissible purpose to obtain a credit report when it "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to […] the consumer[.]"

148.    The scope of this permissible purpose, however, is restricted to obtaining the credit report of the person applying for an extension of credit.

149.    The section does not permit a potential lender to obtain credit reports of persons who are not the consumer applying for the extension of credit.

150.    15 U.S.C. § 1681b(c) governs situations where a potential lender requests a credit report in connection with an extension of credit that is not initiated by the consumer whose credit report the potential lender seeks to obtain.

151.    Under this section, a credit reporting agency can properly release the non-applicant's credit report only if the non-applicant authorizes the credit reporting agency to do so or the transaction involves a firm offer of credit.

152.    A potential lender which obtains a credit report on a person who has not initiated a credit transaction by applying for an extension of credit violates 15 U.S.C. § 1681b(f) unless the person has authorized release of the credit report or the potential lender has made a firm offer of credit to the person.

153.    Defendants DIXIE and PIERCE have violated the FCRA at 15 U.S.C. § 1681b(f) by obtaining and using Plaintiff NINA OWENS' consumer credit report without a permissible purpose that had been certified to the consumer reporting agency.

154. Defendants' conduct, action and inaction was willful, rendering them liable to Plaintiff NINA OWENS for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

155. In the alternative, Defendants were negligent, entitling the Plaintiff NINA OWENS to recover actual damages under 15 U.S.C. § 1681o.

156. Plaintiff NINA OWENS is also entitled to recover costs and attorney's fees from Defendants in an amount determined by the Court pursuant to 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o.

**Count Three:**

**(As to Defendants DIXIE and PIERCE)**

**Violation of the Fair Credit Reporting Act ("FCRA"):  Impermissible Use of the Credit Report of ASHLEY OWENS**

**15 U.S.C. §§ 1681b(f)**

157. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

158. Under the FCRA at 15 U.S.C. § 1681b(f), any person is prohibited from obtaining a credit report on a consumer unless the person has a permissible purpose for procuring the report and certifies that purpose to the consumer reporting agency.

159. The permissible purposes allowed by the Act are set forth in 15 U.S.C. § 1681b.

160. Under 15 U.S.C. § 1681b(a)(3)(A), a potential lender such as DIXIE has a permissible purpose to obtain a credit report when it "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to […] the consumer[.]"

161.    A user who obtains a report for a permissible purpose cannot thereafter also use the report for an impermissible purpose.

162.    A user who obtains a report for a permissible purpose cannot thereafter pass the report on to a third party with an impermissible purpose.

163.    Defendants DIXIE and PIERCE have violated the FCRA at 15 U.S.C. § 1681b(f) by giving Plaintiff ASHLEY OWENS' consumer credit report to Defendant CHERRY to use for an impermissible purpose.

164.    Defendants DIXIE and PIERCE have also violated the FCRA at 15 U.S.C. § 1681b(f) by using Plaintiff ASHLEY OWENS' consumer credit report for an impermissible purpose, that is, badmouthing her to law enforcement as a person with a bad credit report.

165.    Defendants' conduct, action and inaction was willful, rendering them liable to Plaintiff ASHLEY OWENS for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

166.    In the alternative, Defendants were negligent, entitling the Plaintiff NINA OWENS to recover actual damages under 15 U.S.C. § 1681o.

167.    Plaintiff NINA OWENS is also entitled to recover costs and attorney's fees from Defendants in an amount determined by the Court pursuant to 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o.

## Count Four:

### (As to Defendants DIXIE and PIERCE)

### Violation of the Fair Credit Reporting Act ("FCRA"):  Failure to Properly Dispose of Consumer Information Derived from Consumer Reports for a Business Purpose

### 15 U.S.C. §§ 1681w and 16 C.F.R. §§ 682.1, et seq.

168.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

169.     Defendants DIXIE and PIERCE have violated the FCRA at 15 U.S.C. § 1681w and 16 C.F.R. §§ 682.1, et seq. by failing to properly dispose of consumer information derived from the Plaintiffs' consumer reports for Defendants' business purpose.

170.     Defendants' conduct, action and inaction was willful, rendering them liable to Plaintiffs for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

171.     In the alternative, Defendants were negligent, entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

172.     Plaintiffs are also entitled to recover costs and attorney's fees from Defendants in an amount determined by the Court pursuant to 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o.

## Count Five:

## (As to Defendant DIXIE)

## Unfair and Deceptive Trade Practices ("UDAP")

## N.C.G.S. § 75-1.1, et seq.

173.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

174.     The following acts or omissions of Defendant DIXIE also independently constitute unfair and deceptive trade practices in violation of N.C.G.S. 75-1.1:

     a.     Defendant DIXIE falsely and deceptively represented to its customers and members of the general public that it had created and implemented a system of

"physical and electronic safeguards" and "restrict[ed] access" to adequately protect the private and personal identifying information entrusted to it by its customers and potential customers, when, in fact, Defendant DIXIE did not have such a system in place.

b. Defendant DIXIE also falsified a credit application in the name of its ongoing customer, Plaintiff NINA OWENS, without NINA's permission for the purpose of assessing her creditworthiness without her knowledge.

175. Defendant's acts and omissions are also unfair and deceptive in violation of N.C.G.S. § 75-1.1 in that they offend established public policy, and are immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and have the capacity or tendency to mislead.

176. As a result of Defendant's acts and omissions, Plaintiffs have suffered injury including emotional distress, fear, anxiety, and inconvenience in attempting to resolve this matter, have an will incur expenses associated with safeguarding their identities from theft, and have had to hire an attorney.

177. As a result of Defendant DIXIE'S unfair and deceptive trade practices, Plaintiffs are entitled to individual damages, treble damages; and, reasonable attorney's fees and costs pursuant to N.C.G.S. §75-16.

178. Defendant is also liable for punitive damages in that it conducted its wrongful behavior described hereinabove willfully, intentionally, maliciously, and with reckless disregard for Plaintiffs' rights and interests.

**Count Six:**

**(As to Defendant DIXIE)**

**Negligence Per Se for Failure to Comply with Gramm-Leach-Bliley Act**

179.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

180.     The Gramm-Leach-Bliley Act ("GLBA") provides in part that "[i]t is the policy of Congress that each financial institution has an affirmative and continuing obligation … to protect the security and confidentiality of [its] customers' nonpublic personal information."  15 U.S.C. §6801(a).

181.     In other words, the GLBA imposes a duty upon financial institutions to protect their customers' confidential personal information.

182.     As part of its implementation of the GLBA, the Federal Trade Commission (FTC) issued the Safeguards Rule, codified at 16 C.F.R. 314 et seq., which requires that financial institutions under the FTC's jurisdiction have measures in place to keep customer information secure.

183.     The Safeguards Rule requires that financial institutions assess and address risks to customer information in all areas of operation, including employee management and training, information systems, and detecting and managing security breaches.  16 C.F.R. § 314.4.

184.     DIXIE, a motor vehicle dealer that extends credit and arranges for financing for the purchase of vehicles for personal, family, and household use, is a "financial institution" as defined by 16 C.F.R. § 313.3(k) and 16 C.F.R. § 314.2(a) and is subject to the GLBA and the FTC's Safeguards Rule.

185.     In its dealings with Plaintiffs, DIXIE failed, in violation of the Safeguards Rule and GLBA, to implement and follow security procedures regarding customer information, to protect that information's confidentiality, to guard against its own employee's misuse of that

information, to dispose of that information in a secure way, or to detect, report, and stop its employee's suspicious activities regarding customer information.

186.    DIXIE's breach of its duty to protect the Plaintiffs' personal information proximately caused harassment to Plaintiffs, caused emotional distress, inconvenience, and expense to Plaintiffs, and has set Plaintiffs up for an ongoing risk of identity theft and other crimes.

187.    DIXIE's breach of its duty to protect the Plaintiffs' personal information constitutes negligence per se under GLBA and its Safeguards Rule, and Plaintiffs are entitled to compensatory and punitive damages for such negligence.

### Count Seven:

### (As to Defendant DIXIE)

### Breach of Express and Implied Contractual Duty to Safeguard Confidential Financial Information

188.    The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

189.    DIXIE made various representations in its published privacy policy that it would safeguard customers' private information.

190.    In its role as a financing agent, DIXIE also had an implied contractual duty to keep private financial information concerning credit applicants safe and secure.

191.    DIXIE's actions described hereinabove breach its express and implied contractual duties to Plaintiffs to safeguard their private financial information, and DIXIE is therefore liable to Plaintiffs for their direct and consequential damages and for punitive damages in an amount to be determined by the jury.

**Count Eight:**

**(As to Defendants DIXIE and PIERCE)**

**Infliction of Emotional Distress**

192.     The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

193.     Defendants DIXIE and PIERCE had a duty to Plaintiffs, their customer and prospective customer, under the North Carolina Identity Theft Protection Act, the Fair Credit Reporting Act, and the Gramm-Leach-Bliley Act, to maintain the security of Plaintiffs' personal identifying information and dispose of it in a manner that would safeguard Plaintiffs' personal identifying information.

194.     It was reasonably foreseeable that failure to secure Plaintiffs' personal identifying information and to dispose of Plaintiffs' personal identifying information properly could lead to unauthorized access to said information.

195.     It was reasonably foreseeable that failure to secure Plaintiffs' personal identifying information and to dispose of Plaintiffs' personal identifying information properly could lead to the unwanted publicizing of said information.

196.     It was reasonably foreseeable that failure to secure Plaintiffs' personal identifying information and to dispose of Plaintiffs' personal identifying information properly could put Plaintiffs at risk of identity theft, causing severe emotional distress to Plaintiffs.

197.     In the alternative, Defendants' conduct with regard to Plaintiffs' personal identifying information was extreme and outrageous, indicating a reckless disregard and indifference to the likelihood that such conduct would cause severe emotional distress.

198.     Defendants' conduct did in fact lead Plaintiffs to suffer severe emotional distress,

including, but not limited to depression, neurosis, phobia, and paranoia, and Defendants are therefore liable to Plaintiffs for compensatory and punitive damages.

## Count Nine:

## Against Defendant Western Surety Co.

## (LIABILITY OF SURETY)

199.    Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs.

200.    N.C.G.S. § 20-288(e) requires that motor vehicle dealers furnish a corporate surety bond of $50,000.

201.    Under N.C.G.S. § 20-288(e), a purchaser of a motor vehicle may institute an action against a licensed motor vehicle dealer and its surety if the purchaser has suffered any loss or damage by any act of the dealer that constitutes a violation of Articles 12 or 15 of the Chapter 20 of the North Carolina General Statutes.

202.    NINA was the purchaser of a vehicle from DIXIE, and said purchase resulted in DIXIE having access to her personal identifying information.

203.    Defendant DIXIE falsely and deceptively represented to its customers and members of the general public that it had created and implemented a system of "physical and electronic safeguards" and "restrict[ed] access" to adequately protect the private and personal identifying information entrusted to it by its customers and potential customers, when, in fact, Defendant DIXIE did not have such a system in place.

204.    Defendant DIXIE also falsified a credit application in the name of its ongoing customer, NINA, without NINA's permission for the purpose of assessing her creditworthiness without her knowledge.

205.    DIXIE'S unfair and deceptive trade practices involving the use of NINA'S

personal identifying information as detailed hereinabove constitute violations of Article 12 of Chapter 20 at N.C.G.S. § 20-294(6) as follows:

a. DIXIE has engaged in unfair and deceptive acts or practices, in violation of N.C.G.S. § 20-294(6); and

b. DIXIE has knowingly advertised an assertion, representation or statement of fact which is untrue, misleading or deceptive relating to the conduct of its licensed dealership, in violation of N.C.G.S. § 20-294(7).

206. WESTERN SURETY CO. provided the motor vehicle dealer surety bond for DIXIE at all relevant times, and is thus liable to NINA for DIXIE'S said acts and omissions.

## Count Ten:

### (As to Defendant CHERRY)

### Tort of Intrusion into Seclusion.

207. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

208. By making repeated unwanted telephone calls to ASHLEY, examining without authorization documents containing her personal identifying and financial information, and virtually holding said information hostage, Defendant CHERRY has intentionally intruded upon ASHLEY'S solitude or seclusion and her private affairs and concerns.

209. Such an intrusion would be highly offensive to a reasonable person.

210. As a result of Defendant CHERRY's actions, ASHLEY has suffered injury including emotional distress, fear, anxiety, and inconvenience in attempting to resolve this matter, and has had to hire an attorney.

211. By examining without authorization documents containing NINA'S personal

identifying and financial information, Defendant CHERRY has intentionally intruded upon NINA'S solitude or seclusion and her private affairs and concerns.

212. Such an intrusion would be highly offensive to a reasonable person.

213. As a result of Defendant CHERRY's actions, NINA has suffered injury including emotional distress, fear, anxiety, and inconvenience in attempting to resolve this matter, and has had to hire an attorney.

214. Plaintiffs are entitled to damages from Defendant CHERRY in an amount to be determined by the jury at trial.

**Count Eleven:**

**(As to Defendant EQUIFAX)**

**Violation of the Fair Credit Reporting Act ("FCRA"): Wrongful Release of the Credit Report of NINA OWENS**

**15 U.S.C. §§ 1681b(c) and 1681e(a)**

215. The allegations of the preceding paragraphs are re-alleged and incorporated by reference as if set forth fully herein.

216. Defendant EQUIFAX has violated the FCRA at 15 U.S.C. § 1681b(c) by furnishing NINA OWENS's consumer report to DIXIE when NINA had not authorized such release, and has violated the FCRA at §1681e(a) by failing to follow reasonable procedures to limit the furnishing of consumer reports to those with permissible purposes.

217. As a result of EQUIFAX's conduct, action, and inaction, NINA suffered emotional distress, and the presence of the inquiry on her credit report may negatively affect her credit score.

218. EQUIFAX's conduct, action and inaction was willful, rendering it liable for

actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

219.    In the alternative, Defendant was negligent, entitling the NINA to recover actual damages under 15 U.S.C. § 1681o.

220.    NINA is also entitled to recover costs and attorney's fees from Defendant in an amount determined by the Court pursuant to 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ASHLEY OWENS and NINA OWENS pray the Court to:

1.    On Plaintiffs' First Cause of Action, award each Plaintiff individually damages and punitive damages or, in the alternative, trebling of damages pursuant to N.C.G.S. § 75-16, for each violation by Defendant DIXIE of the Identity Theft Protection Act;

2.    On Plaintiffs' Second, Third, Fourth, and Eleventh Causes of Action, Find that the conduct, action and inaction of Defendants DIXIE, PIERCE, and EQUIFAX was willful, rendering them liable to each Plaintiff individually for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681n; or, in the alternative, find that said Defendants were negligent, entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

3.    On Plaintiffs' Fifth Cause of Action, award each Plaintiff individually compensatory and punitive damages, or, in the alternative, trebling of damages pursuant to N.C.G.S. § 75-16 for Defendant DIXIE's violations of  N.C.G.S. § 75-1.1 (unfair and deceptive trade practices).

4.    On Plaintiffs' Sixth and Eighth Causes of Action, award each Plaintiff individually compensatory and punitive damages for the negligence of Defendants DIXIE and PIERCE.

5.   On Plaintiffs' Seventh Cause of Action, award each Plaintiff individually direct, consequential, and punitive damages for breach of contract by Defendant DIXIE.

6.   On Plaintiffs' Ninth Cause of Action, in the event that the jury finds Defendant DIXIE liable for the acts or omissions described therein, award Plaintiff Nina Owens her damages for such acts or omissions up to the available amount of the motor vehicle dealer surety bond provided by WESTERN and order WESTERN to make payment of such amount to NINA.

7.   On Plaintiffs' Tenth Cause of Action, award Plaintiffs compensatory damages for the intentional torts of Defendant CHERRY.

8.   Award Plaintiffs their costs of litigation and reasonable attorney's fees pursuant to N.C.G.S. § 75-16.1 and 15 U.S.C. § 1681n, or, in the alternative, 15 U.S.C. § 1681o;

9.   Award Plaintiffs pre-judgment and post-judgment interest;

10. Grant trial before a jury on all issues so triable; and

11. Grant such other and further relief as the Court deems just and proper.

THIS the 28th day of June, 2012.

Respectfully submitted,

By:    /s/Suzanne Begnoche
SUZANNE BEGNOCHE
Suzanne Begnoche, Attorney at Law
Attorney for Plaintiffs
NCSB # 35158
312 West Franklin Street
Chapel Hill, NC  27516
begnoche@mindspring.com
Telephone: (919) 960-6108
Facsimile: (919) 500-5289